**Not for Publication**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| THOMAS SHANNON, | : | |
| | : | |
| Petitioner, | : | Civ. No. 18-15420 (PGS) |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES OF AMERICA, | : | **OPINION** |
| | : | |
| Respondent. | : | |
| | : | |

## PETER G. SHERIDAN, U.S.D.J.

### I.    INTRODUCTION

Petitioner, Thomas Shannon ("Petitioner"), a federal prisoner, filed a motion to vacate, set aside or correct his sentence pursuant to 28 U.S.C. § 2255 and an accompanying memorandum of law. (ECF No. 1, "Motion"; ECF No. 9.) Following an order to answer, the Government filed an answer to the Motion. (ECF No. 19.) The Court's previous December 2021 Opinion and Order dismissed all but one of Petitioner's claims. (ECF Nos. 35, 36.) The Court held an evidentiary hearing on the sole remaining claim and the parties submitted additional briefing on the issue. For the reasons set forth below, the Court will deny Petitioner's remaining claim and will not issue a certificate of appealability.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

The factual background of Petitioner's underlying criminal proceedings is taken from the United States Court of Appeals for the Third Circuit Opinion on Petitioner's direct appeal.

> [B]etween 2013 and 2014, Shannon participated in a drug trafficking conspiracy that stretched from California to New Jersey. On multiple occasions, Shannon ordered heroin and cocaine from California-based suppliers and then transferred the narcotics to a drug trafficking organization in New Jersey. The Federal Bureau of Investigation intercepted a drug shipment from California headed for a stash house in Long Branch, New Jersey on March 20, 2014. Agents conducted a controlled delivery, with one law enforcement agent posing as a mail carrier who personally delivered the drug package to Shannon at the Long Branch stash house. When Shannon approached the postal truck, law enforcement agents arrested him and seized both the drug package and his cell phone.
>
> On the same date, agents executed search warrants at locations including stash houses in Asbury Park and Long Branch and Shannon's Jersey City residence. At the Asbury Park stash house—where visual surveillance had previously placed Shannon—law enforcement recovered two semi-automatic firearms (one of which had a magazine with eight rounds) inside a black box stored inside a closet in the bedroom; 898.5 grams of heroin, 555.4 grams of cocaine, and 24.1 grams of cocaine base stored in the black box; more than 18,000 individual doses of heroin in plastic bags on a shelf in the same closet; various drug-related paraphernalia; correspondence addressed to Shannon inside a cardboard box on the top shelf of the same closet; an invoice addressed to Shannon on the bedroom floor; sheets of paper with Shannon's name in the living room; and utility bills, rent receipts, and a 2012 lease for the premises, all in Shannon's name.

Additional drug paraphernalia was recovered at the Long Branch stash house.

In the master bedroom of Shannon's Jersey City residence, meanwhile, agents found a loaded revolver and a box of ammunition in a nightstand by the bed; a second box of ammunition above the ceiling tile above the bed; $117,000 in cash in safes under the bed and in a dresser drawer; $50,000 of deposit slips reflecting cash deposits; and two car titles and a registration document in Shannon's name.

A grand jury returned a five-count indictment charging Shannon with conspiracy to distribute and to possess with intent to distribute cocaine and one kilogram or more of heroin, in violation of 21 U.S.C. § 846; possession with intent to distribute 100 grams or more of heroin and 500 grams or more of cocaine, in violation of 21 U.S.C § 841(a)(1); possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1); possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i); and money laundering, in violation of 18 U.S.C. § 1957. The District Court bifurcated the § 922(g) charge, which would be presented to the jury following its verdict as to the other counts.

. . . .

During trial, the jury heard evidence of phone calls and text messages that were intercepted pursuant to a court-sanctioned wiretap. Special Agent Charles Malos, the case agent who testified as a government witness, identified the participants on the intercepted phone calls and interpreted language used in both the calls and text messages. Specifically, based on his experience listening in on the intercepted phone calls and reviewing text messages over a period of months, Special Agent Malos testified that: (1) "math" referred to "a quantity of either drugs or money"; (2) "Christine," "white girl," and "bitch" referred to cocaine; (3) "Street" and "Chinatown" referred to heroin; (4) "she's coming today" meant that a package of narcotics

would be arriving; and (5) "touchdown" meant that a package of narcotics had been delivered. In addition, he identified the voice of Shannon on several calls.

The jury also heard testimony from the following Government witnesses: co-conspirator Marlon Ramos, agents who executed the search warrants, a firearms expert, a forensic chemist, and a forensic accountant.

On May 25, 2016, the federal jury convicted Shannon of the four non-bifurcated counts. Sentencing was held on September 19, 2016. At the hearing, defense counsel objected to the application of the organizer or leader enhancement under section 3B1.1(a) of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"), arguing that Shannon was instead "at the bottom or second [to] last rung of the conspiratorial ladder." A 16. The District Court disagreed, finding that the evidence at trial established that Shannon maintained stash houses, directed the transportation of drugs from California to New Jersey, participated in making cash deposits into various accounts, and maintained numerous cell phone communications with co-conspirators. With respect to the criminal history category calculation, defense counsel asserted that the District Court's calculation overstated Shannon's record. Counsel emphasized that several offenses occurred more than 15 years from the date of the instant arrest and that Shannon was "substantially offense-free until the time of this incident." A 29. The District Court, however, denied the motion for a departure in light of the time period of prior incarceration and record that reflected an "ongoing issue with regard to drug trafficking, and possession or use of handguns." A 34.

The District Court determined Shannon's total offense level to be 37 and criminal history category to be VI. The District Court also found that Shannon was a career offender under U.S.S.G. § 4B1.1(b). The advisory guidelines range was therefore 420 months to life. The District Court granted a downward variance based upon

> his family relationships, citizenship, and age and imposed
> a sentence of 300 months in prison to be followed by five
> years of supervised release.

*United States v. Shannon*, 715 F. App'x 187, 189–91 (3d Cir. 2017).

The Third Circuit affirmed this Court's judgment of conviction on November 1, 2017. *See id.* at 189. Petitioner did not file a petition for writ of certiorari with the Supreme Court on direct appeal.

On October 17, 2018, Petitioner filed his § 2255 motion. (ECF No. 1.) Petitioner then filed a memorandum of law in support of his § 2255 motion. (ECF No. 9.) On December 15, 2021, the Court filed an Opinion and Order dismissing all but one of Petitioner's claims. (ECF Nos. 35, 36.) The Court reserved decision on Petitioner's claim that trial counsel coerced Petitioner to go to trial instead of pleading guilty and ordered an evidentiary hearing on the issue. (*See id.*) On February 9, 2023, the Court held an evidentiary hearing on Petitioner's remaining issue.

## III.   LEGAL STANDARD

A motion to vacate, set aside or correct a sentence of a person in federal custody pursuant to 28 U.S.C. § 2255 entitles a prisoner to relief if "the court finds . . . [t]here has been such a denial or infringement of the constitutional rights of the prisoner as to render judgment vulnerable to collateral attack." 28 U.S.C. § 2255(b). "In considering a motion to vacate a defendant's sentence, 'the court must accept the

truth of the movant's factual allegations unless they are clearly frivolous based on the existing record.'" *United States v. Booth*, 432 F.3d 542, 545 (3d Cir. 2005) (quoting *Gov't of Virgin Islands v. Forte*, 865 F.2d 59, 62 (3d Cir. 1989)) (citing R. Governing § 2255 Cases R. 4(b)). A District Court "is required to hold an evidentiary hearing 'unless the motion and files and records of the case show conclusively that the movant is not entitled to relief.'" *Id.* (quoting *Forte*, 865 F.2d at 62). The Third Circuit has stated that this standard creates a "'reasonably low threshold for habeas petitioners to meet.'" *Id.* (quoting *United States v. McCoy*, 410 F.3d 124, 134 (3d Cir. 2005) (quoting *Phillips v. Woodford*, 267 F.3d 966, 973 (9th Cir. 2001))). Accordingly, this Court abuses its discretion "if it fails to hold an evidentiary hearing when the files and records of the case are inconclusive as to whether the movant is entitled to relief." *Id.* (citing *McCoy*, 410 F.3d at 134).

## IV.   DISCUSSION

The Court previously summarized Petitioner's remaining claim as follows:

> Petitioner [] asserts trial counsel coerced him to trial by claiming Petitioner would win on appeal even if a jury convicted Petitioner. According to Petitioner, counsel told him "in his best opinion" they "could beat the case," but that even if they lost, the case "would" be reversed on appeal for insufficient evidence. (*See* ECF No. 9 at 6). Petitioner claims counsel told him the government's case was weak because it only showed a buyer-seller relationship, which would have presumably been insufficient to convict Petitioner. Petitioner claims that, but for counsel underestimating the strength of the government's case, he would have accepted the

> government's plea offer of 15-20 years imprisonment (as
> noted above Petitioner received a twenty-five-year
> sentence).

(ECF No. 35 at 11).

Petitioner alleges that he declined the state's offer of 15-20 years
imprisonment based on trial counsel's erroneous advice that Petitioner would win at
trial, and even if he did not, Petitioner would prevail on appeal.[1] In light of these
allegations, the Court held an evidentiary hearing. Both Petitioner and trial counsel
testified at the hearing.

*Hearing Testimony*

Petitioner testified that he was originally represented by Federal Defender
Andrea Bergman following his arrest in 2014. (ECF No. 57, Evidentiary Hearing
2/9/2023, at 13:9-14.) Petitioner testified that Ms. Bergman explained to Petitioner
the potential sentences he was facing and that this was "a serious case [with]
significant jail exposure." (*Id.* at 14:3-11.) Petitioner explained that while he was
housed in Monmouth County jail, he had the opportunity to speak with attorney
Michael Pappa, who had previously represented Petitioner. (*Id.* at 25:8-14.)
According to Petitioner, based on the charges Petitioner faced and his prior criminal
history, Mr. Pappa suggested that Petitioner explore the possibility of cooperation

---

[1] The parties also raise the issue of whether the state's offer of 15-20 years imprisonment was an
informal or formal offer. For the reasons discussed below, the Court's finds trial counsel was not
ineffective during the plea offer stage. Therefore, the Court need not decide whether the 15-20
year offer was an informal or a formal offer.

with the Government and "seek to get a 5K1."[2] (*Id.* at 25:14-18.) Petitioner claims that based on Mr. Pappa's advice and with the assistance of Ms. Bergman, Petitioner participated in two separate proffer sessions with Assistant United States Attorney Nicholas Grippo. (*See id.* at 16:20 to 24:25.) Petitioner provided the Government with information about other crimes of drugs and homicides. (*Id.* at 24:6.)

Regarding how trial counsel, Edward Bertucio, came to represent Petitioner, Petitioner testified that Mr. Bertucio was at the prison seeing another client and Petitioner asked to speak with him. (*Id.* at 26:6-7.) According to Petitioner, Mr. Bertucio "told [him] that it sounded like the case was triable, that he could probably beat the case." (*Id.* at 26:9-10.) Petitioner testified that Mr. Bertucio had previously represented him. (*Id.* at 27:7-8.) Petitioner trusted Mr. Bertucio and knew that he was known for being an "aggressive lawyer." (*Id.* at 27:8-9.) Mr. Bertucio had previously represented Petitioner in a "drug case" that "[they] more or less beat" and an attempted murder charge "where he got [Petitioner] three flat." (*Id.* at 27:11-15.) At their initial meeting, Petitioner alleges that he informed Mr. Bertucio regarding his cooperation with the Government, and Mr. Bertucio advised against it. (*Id.* at 28:2-10.) Petitioner alleges that Mr. Bertucio told him that if he represented Petitioner he would not want him to continue to cooperate because "he doesn't

---

[2] "5K" refers to U.S.S.G. § 5K.1. If the Government determined that Petitioner had adequately cooperated, it would inform the Court of Petitioner's cooperation and move for a downward departure from the sentencing guidelines pursuant to U.S.S.G. § 5K.1.

represent cooperators." (*Id.* at 28:20-21.) Following that meeting, Petitioner retained Mr. Bertucio as counsel.

Mr. Bertucio testified that when he first met with Petitioner, Petitioner expressed his dissatisfaction with Ms. Bergman's representation because he was uncomfortable with the strategy she was taking. (*Id.* at 101:14-18; 124:6-19.) Mr. Bertucio admitted that Petitioner informed him that he was considering cooperation that would potentially lead to a 5K plea deal. (*Id.* at 102:3-7.) Mr. Bertucio testified that once Petitioner informed him regarding what "he was looking at", Mr. Bertucio did not think "going down the cooperation road was the way for him to go." (*Id.* at 102:15-17.) Mr. Bertucio testified that it is true that he has a general rule that he does not represent cooperators because it creates conflicts of interest with his other clients and potential clients, but that all rules have exceptions, and he has represented clients who cooperated with the Government. (*Id.* at 99:21 to 100:19; 103:9-16.) Mr. Bertucio testified that if he cannot represent an individual because of their cooperation, he will give that individual the names of two other lawyers. (*Id.* at 101:1-5.) Mr. Bertucio testified that at their initial meeting Petitioner did not tell him that he was cooperating to get the best result he could get. (*Id.* at 104:5-9.) Rather, Mr. Bertucio testified to the following:

> [Petitioner] was expecting to get probation [] and I explained to him he was looking at 40 years to life and he was a career offender. I knew that the first time I spoke to him. And so I was trying to disabuse him of the non-reality

> that he was going to walk out of here with probation on
> this particular case.
>
> I don't know what conversation he had with his lawyer
> before me because he was still represented by her, and
> there was attorney-client privilege. But I told him, I said,
> based on what you're looking at, you're looking at a lot
> more than probation.

(*Id.* at 104:11-21.) Mr. Bertucio testified that based on what Petitioner told him, he believed Petitioner changed his mind regarding cooperation because "he was still looking at decades in prison, and he was also looking at a requirement that he testify against very dangerous people on the West Coast who were much high up in drug dealing than him. That's what changes his opinion and that's probably why he's sitting next to you alive today." (*Id.* at 105:17-22.) Mr. Bertucio testified that Petitioner made the decision to hire Mr. Bertucio and proceed to trial, rather than continue his cooperation on his own, not because Mr. Bertucio encouraged him to do so. (*Id.* at 108:7-8.)

Petitioner testified that after he turned down the Government's initial guidelines plea offer of 30-40 years in August 2014, Mr. Bertucio informed Petitioner that he was willing to "sit down with Monmouth County" regarding an unsolved homicide but Mr. Bertucio would not "sit down with the U.S. Government or the prosecutor." (*Id.* at 34:2-9.) Petitioner alleges that when he asked Mr. Bertucio about cooperating with the Government, Mr. Bertucio said that he would not help him with that, and he would have to hire another attorney. (*Id.* at 35:22 to 36:2.)

Regarding the plea offer at issue here, Petitioner testified that after he was indicted, Mr. Bertucio discussed with him the option of a "C plea"[3] involving 18-20 years "or something like that." (*Id.* at 37:24 to 38:12.) According to Petitioner, Mr. Bertucio recommend against Petitioner accepting that plea offer, indicating that "those aren't the type of numbers that we're looking for, that [Petitioner] stood a better chance in trial." (*Id.* at 39:15-20.) Petitioner testified that Mr. Bertucio recommended against that plea because he felt the case was in the wrong venue, that he could beat the § 924(c) charge, and that Petitioner "could come back on appeal, that he most certainly was guaranteeing that [he] could come back on appeal like [they] did the first drug case that he tried in state." (*Id.* at 40:1-11.) Petitioner testified that Mr. Bertucio told him they were looking for numbers such as eight, nine, or ten years. (*Id.* at 40:13-19.)

Petitioner testified that in January 2016, Mr. Bertuccio again told Petitioner that he had discussed a C plea of 15-20 years with the Government. (*Id.* at 41:16-22.) Petitioner first claimed that Mr. Bertucio did not go over the plea offer with him, but then he testified that he "ran it by [him]" but did not think it was reasonable, nor did he approve of Petitioner's accepting the offer. (*Id.* at 42:5-11.) Petitioner

---

[3] Pursuant to Federal Rule of Civil Procedure 11(c)(1)(C), the government and a defendant may enter into a plea agreement which specifies that that the Government will "agree that a specific sentence or sentencing range is the appropriate disposition of the case, or that a particular provision of the Sentencing Guidelines, or policy statement, or sentencing factor does or does not apply (such a recommendation or request binds the court once the court accepts the plea agreement)."

denied receiving a January 6, 2016, letter from Mr. Bertucio laying out two separate plea options, even though the letter was addressed to Monmouth County Correctional Institution and indicated "via hand delivery." (*Id.* at 43:8 to 44:1.) Petitioner admitted that Mr. Bertucio did meet with him and explain the two plea offers that were in the letter. Petitioner testified:

> Q. And it talked about two plea offers that were - - for you to consider, correct?
> A. Correct
> Q. And the most beneficial one, so to speak, would have been the 15 to 20 year soft C plea, correct?
> A. Correct.
> Q. And you rejected that, did you not?
> A. Based off Mr. Bertucio's advice.
> Q. What do you mean by that?
> A. He said that's not a reasonable number, that I stood a better chance at trial, that he could beat it at trial.
> Q. So there's a signature down the bottom, correct?
> A. Yes.
> Q. And you signed that?
> A. I did, yes.
> Q. And did you sign it as a result of the advice that Mr. Bertucio gave you?
> A. Correct.
> Q. To reject this?
> A. Yes.

(*Id.* at 44:14 to 45:8.) Petitioner testified that he would have accepted the offer if Mr. Bertucio had recommended it. (*Id.* at 46:1-4.)

Mr. Bertucio testified that he would never advise a client to proceed to trial if it was not in their best interest. (*Id.* at 68:6-8.) Additionally, Mr. Bertucio explained that he would never guarantee a defendant would win at trial because "even if [he]

th[ought] [his] client ha[d] a very strong case, which was not the case here, [he] can't predict what a jury's going to do." (*Id.* at 68:10-20.) Mr. Bertucio also testified that he would not guarantee a client that they will win on appeal. (*Id.* at 68:21-23.)

Mr. Bertucio explained that after Petitioner was indicted, he had "numerous" conversations with the Government regarding different potential resolutions. (*Id.* at 78:2-12.) Mr. Bertucio testified that Petitioner was not interested in any prison sentence where he would plead guilty and face double-digit prison terms. (*Id.* at 80:17-19.) Additionally, Mr. Bertucio testified that he explained to Petitioner that "it's not like state court, where if I get the prosecutor and I to agree to seven, eight, nine years, that's what the judge is going to do. Federal judges [] have [] leeway in deciding what to do, and they don't have to follow what the parties agree to." (*Id.* at 80:20 to 81:1.)

Mr. Bertucio testified that he did have discussions with the Government regarding Petitioner cooperating. He testified that:

> At one point they were interested in Mr. Shannon cooperating against people in California. He was not interested in that whatsoever. There were conversations about the homicide case. I remember Mr. Grippo not being particularly, how can I say this because I like Nick, but particularly receptive to Mr. Shannon getting a substantial reduction for testifying in a homicide case where, without his testimony, the client may get acquitted.
>
> And that led to discussions about a particular federal rule that would actually allow the county prosecutor's office to make an application for reduction of sentence even over

the objection of the U.S. Attorney's Office. So we had a
great deal of conversations about this.

(*Id.* at 85:22 to 86:9.) Regarding the proposed 15-20 year Rule 11(c) plea offer at

issue here, Mr. Bertucio testified that he met with Petitioner and reviewed the

proposed offer. (*Id.* at 86:18 to 87:20.) Petitioner rejected the offer and signed a

document indicating his rejection of the offer. (*Id.*) Mr. Bertucio testified that he did

not guarantee a victory at trial or on appeal and did not coerce Petitioner to go to

trial. (*Id.* at 90:8-20.) Mr. Bertucio testified that the decision to reject the proposed

offer was "[Petitioner's] and his alone." (*Id.* at 90:21-23.)

### *Petitioner's Claim*

As explained above, Petitioner was offered a 30-40 year plea offer from the

government in August, 2014. (*See* ECF No. 23-14). Petitioner ultimately rejected

that offer. (*See* Crim. No. 15-275, ECF No. 321 at 4-7). Petitioner's claim is that he

then rejected another plea offer of 15-20 years imprisonment from the government

due to counsel's purported ineffectiveness regarding the strength of the

government's case against him. Petitioner also argues that counsel gave him the false

impression that, even if he were convicted, his case would be reversed on direct

appeal due to insufficient evidence. (*See* ECF No. 62 at 1.) Petitioner alleges that

had counsel clearly and definitively emphasized the strengths of the government's

case, he would have accepted the 15-20 year plea proposal. (*Id.* at 2.)

The Sixth Amendment guarantees effective assistance of counsel. In *Strickland v. Washington,* 466 U.S. 668 (1984), the Supreme Court articulated the two-prong test for demonstrating when counsel is deemed ineffective. First, the petitioner must show that considering all the circumstances, counsel's performance fell below an objective standard of reasonableness. *See id.* at 688; *see also Grant v. Lockett*, 709 F.3d 224, 232 (3d Cir. 2013) (noting that it is necessary to analyze an ineffectiveness claim considering all circumstances) (citation omitted). A petitioner must identify the acts or omissions that are alleged not to have been the result of reasonable professional judgment. *See Strickland*, 466 U.S. at 690. Under this first prong of the *Strickland* test, scrutiny of counsel's conduct must be "highly deferential." *See id.* at 689. Indeed, "[c]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. The reviewing court must make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. If counsel makes "a thorough investigation of law and facts" about his plausible options, the strategic choices he makes accordingly are "virtually unchallengeable." *Gov't of Virgin Islands v. Weatherwax*, 77 F.3d 1425, 1432 (3d Cir. 2006) (citing *Strickland*, 466 U.S. at 690-91). If, on the other hand, counsel pursues a certain strategy after a less than complete

investigation, his choices are considered reasonable "to the extent that reasonable professional judgments support the limitations on investigation." *Rolan v. Vaughn*, 445 F.3d 671, 682 (3d Cir. 2006) (citing *Strickland*, 466 U.S. at 690-91).

The second prong of the *Strickland* test requires the petitioner to affirmatively prove prejudice. *See* 466 U.S at 693. Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.*; *see also McBridge v. Superintendent, SCI Houtzdale*, 687 F.3d 92, 102 n.11 (3d Cir. 2012). "This does not require that counsel's actions more likely than not altered the outcome, but the difference between *Strickland's* prejudice standard and a more-probable-than-not standard is slight and matters only in the rarest case. The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 111-12 (2011) (internal quotation marks and citations omitted).

In context of pleas, counsel is required to provide a criminal defendant with sufficient information to "make a reasonably informed decision whether to accept a plea offer," which generally requires that counsel discuss with him the facts of his case, the likelihood of conviction at trial, and his comparative sentencing exposure under a proposed plea in relation to a sentence following a conviction at trial. *United States v. Bui*, 795 F.3d 363, 366-67 (3d Cir. 2015) (quoting *Shotts v. Wetzel*, 724

F.3d 364, 376 (3d Cir. 2013)); *see also Lafler v. Cooper*, 566 U.S. 156, 163 (2012); *Hill v. Lockhart*, 474 U.S. 52, 57-58 (1985). "[A] [petitioner] must show the outcome of the plea process would have been different with competent advice." *Lafler*, 566 U.S. at 163 (citations omitted).

"With respect to the sequence of the two prongs, the *Strickland* Court held that 'a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.... If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed.'" *Rainey v. Varner*, 603 F.3d 189, 201 (3d Cir. 2010) (quoting *Strickland*, 466 U.S. at 697).

First, Petitioner argues that he "retained M[r.] Bertucio for the sole reason to defend him in trial based upon Mr. Bertucio's statement that he could win the case in trial or on appeal." (ECF No. 62 at 4.) Petitioner claims that he was already cooperating with the Government and "going to trial was not something he was thinking of doing when he first spoke with Mr. Bertucio." (*Id.* at 5.) Petitioner alleges that his initial "change in direction" and decision to stop cooperating and to retain Mr. Bertucio "was solely and directly connected to the trust he placed in Mr. Bertucio, which led him to believe trial was the way to go." (*Id.* at 7.)

However, the Court notes that although Petitioner alleges that he was well on his way to a 5K plea and was actively cooperating with the Government, Petitioner

admits that he sought out Mr. Bertucio when he encountered him in Monmouth County jail. Petitioner was well versed in the criminal justice system, testifying that he had been convicted of numerous other felonies, some of which he plead guilty to and some that went to trial. (ECF No. 57 at 47:17-23.) Petitioner acknowledged that he was aware of his career offender status and the evidence against him. (*Id.* at 48:11 to 49:6.) Petitioner also admitted that he had "success" with Mr. Bertucio representing him previously. (*Id.* at 51:2-6.) Mr. Bertucio testified that since graduated law school in 1983 "by and large [his] entire career has been focused on criminal" work and he represented clients in tens of thousands of criminal proceedings, including several hundred in federal court. (*Id.* at 65:12 to 66:20.)

Mr. Bertucio confirmed that Petitioner saw him in Monmouth County jail and asked to speak with him. (*Id.* at 73:3-7.) Mr. Bertucio testified that they spoke in general terms about Petitioner's case and Petitioner informed him that he was in the middle of a cooperation agreement and what he was "looking at" sentence wise even if the Government agreed to the agreement. (*Id.* at 73:9-19.) Mr. Bertucio testified that Petitioner had been hoping to get probation based on his cooperation and Mr. Bertucio informed him he was facing serious time. (*Id.* at 104:11-21; 105:17-22.) The Court finds Mr. Bertucio's testimony credible. Based on the testimony that Petitioner sought out Mr. Bertucio, that Petitioner was very familiar with the criminal system, that Petitioner had previous success with Mr. Bertucio as his

counsel, that Petitioner was facing a lengthy sentence, and the fact that the first offer from the Government was for 30-40 years imprisonment, the Court credits Mr. Bertucio's testimony that he did not convince Petitioner to stop cooperating and to retain him based on a promise that Petitioner would win at trial or on appeal. The Court credits Mr. Bertucio's testimony that Petitioner made the choice to retain him on his own.

Next, Petitioner blames his decision to reject the pre-trial 15-20 year C plea offer on Mr. Bertucio's refusal to represent cooperators and his giving Petitioner "false hope that his skills as a trial lawyer would save the day for [Petitioner] with either a successful verdict or successful appeal." (ECF No. 62 at 5-7.) However, Petitioner admits, and Mr. Bertucio testified, that he did sit down with Petitioner and Monmouth County Prosecutor's Office and Petitioner cooperated in a murder case. (ECF No. 57 at 109:8 to 110:15.) Mr. Bertucio testified that he asked the Government if Petitioner could obtain consideration for his cooperation and the Government declined. (*Id.* at 113:1-18.) Additionally, the Court notes that Petitioner argues that Mr. Bertucio would not represent him if he cooperated, however, the claim before the Court is that Mr. Bertucio coerced Petitioner into rejecting the proposed 15-20 year plea offer. Petitioner fails to show that the proposed 15-20 year plea offer was in any way tied to Petitioner cooperating. Therefore, Petitioner's

argument regarding Mr. Bertucio's position on Petitioner cooperating would not be relevant to the proposed 15-20 year plea offer.

Regarding Mr. Bertucio's advice to his clients when considering accepting a plea or going to trial, he testified as follows:

> Q.   So what would you say your role is in helping an individual decide whether to proceed to trial or to plead guilty?
>
> A.   Well, I think being a counselor at law, counsel is an important issue. So I have to advise the client of the risks and rewards of trial versus plea. And as I've gotten older, I've gotten better at that. And then also to try to get as close to the result that the client wants as I can, which is not always exactly there, but close.
>
> Q.   Can you force an individual to go to trial?
>
> A.   I've never done that ever.
>
> Q.   Can you force an individual to plead guilty?
>
> A.   Never done that ever. The answer would be no and no, but I've never done it.
>
> Q.   Would you ever, as a general matter, advise a client to proceed to trial when you believed that it's not in their best interest?
>
> A.   Absolutely never.
>
> Q.   Would you ever guarantee that a defendant would win at trial?
>
> A.   I'd be out of my mind if I said that, so the answer is no.
>
> Q.   Why wouldn't you say that?
>
> A.   Well, even if I think my client has a very strong case, which was not the case here, I can't predict what a jury's going to do. I can't even predict what kind of jury I'm going to have. I also can't predict how the case is going to unfold. I know one thing. The case I read in the file is never the case that comes out of that jury box or this seat here. So I can't predict that. I'm not a soothsayer.

> Q. And so in a similar vein, would you ever guarantee that a defendant would win on appeal, an issue on appeal?
>
> A. No.

(ECF No. 57 at 67:17 to 68:23.) Mr. Bertucio testified that he went over the 15-20 year proposal "at great length" with Petitioner. (*Id.* at 87:4-20.) According to Mr. Bertucio, he never guaranteed and never would guarantee that Petitioner would win at trial or on appeal. (*Id.* at 90:8-15.) Mr. Bertucio explained that Petitioner rejected the proposed offer because he was still hoping for single digit sentencing numbers, even though Mr. Bertucio told him that was not going to happen. (*Id.* at 87:23 to 88:1.) The Court notes that Mr. Bertucio is a seasoned and savvy attorney who acts carefully when discussing pleas with clients. The Court credits Mr. Bertucio's testimony that he told Petitioner:

> [Petitioner] should take the best plea [he] could negotiate, and he had to choose between two choices. And [Mr. Bertucio] also told him that since it could even go better than 15 to 20 if he was a key witness in a major murder case. And the assistant prosecutor did do that in this case, because he wrote a letter to His Honor, came here and spoke on his behalf. That's what [he] said to him.

(*Id.* at 123:4-10.)

Petitioner is an educated individual, with knowledge of the criminal justice system. Mr. Bertucio is a seasoned criminal defense attorney. The Court finds Petitioner's testimony that Mr. Bertucio guaranteed him a victory at trial or on appeal and coerced him into rejecting a proposed 15-20 year plea offer because Mr.

Bertucio wanted Petitioner to go to trial incredible. The Court credits Mr. Bertucio's testimony that he discussed with Petitioner the strength of the Government's case against him, his sentencing exposure, and the proposed 15-20 year plea offer. The Court finds that Petitioner made an informed decision to reject the proposed plea offer. Petitioner has not shown that Mr. Bertucio's representation fell below objective standard of reasonableness. *See Strickland, 466* U.S. at 688. His claim that Mr. Bertucio provided ineffective assistance in the process of deciding to reject or accept the proposed 15-20 year plea offer therefore fails. Petitioner did not receive ineffective assistance from Mr. Bertucio.

## V.   CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability ("COA"), an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2255. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In *Slack v. McDaniel*, 529 U.S. 473, 484 (2000), the United States Supreme Court held: "[w]hen the district court denies a habeas petition on

procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.*

Petitioner has not met the standard for a COA on his claim discussed in this opinion. Thus, a COA will not issue.

## VI.   CONCLUSION

For the foregoing reasons, Petitioner's claim is denied as meritless. A certificate of appealability shall not issue. An appropriate order follows.


DATED: September 19, 2023


PETER G. SHERIDAN
United States District Judge